Good morning, Your Honor. May I please the Court and Counsel Mike Rattoza for the appellant in motion? This is our appeal of the- There's a little background noise in this room, so you'll have to try to keep your voice up a little bit, please. Thank you. It's actually much cooler up here than it was back there. This is our appeal of the trial court's award of summary judgment to the defendant in dismissing the case. And we submit that the trial judge failed to identify significant serious material issues of fact and dispute. Summary judgment should not have been awarded. The case should not be dismissed. And this case should be remanded. Very briefly, with respect to the factual background, ProPilot is an off-the-shelf type of computer software owned by a company in Seattle called Sierra. It allows you to pretend to fly an airplane with amazing visual graphics. The plaintiff learned that ProPilot was going to be discontinued. It would be available to be purchased, developed a business plan, and was looking for partners to fund that business plan. In January, early January of 2000, the plaintiff sent a solicitation to the defendant's president containing a summary of the type of advantages or features or descriptions that might be available in certain circumstances. And inquired whether the defendant was interested in pursuing this business opportunity. The defendant was, and invited the plaintiff to meet later that month, January 18, in Orlando. At that time, the plaintiff presented a form of agreement, non-disclosure, non-compete. The defendant stated, let's sign our form. They did, with some modification. There is considerable evidence in the record that the plaintiff would not have continued with that meeting in Orlando, but for the signing of this agreement. The plaintiff was prepared to walk out and not spill the beans, as it was, and disclose the further details of its ideas and information of how ProPilot would benefit this defendant. With that background, the defendant signed the agreement. The agreement states, set out in the brief, that the agreement pertains to all information, without limitation, very broad, including information regarding ProPilot, plus other digital-based systems and software engineering solutions. It doesn't actually cover all information. I mean, the prerequisite is that the information is proprietary or confidential. That's correct. The information or material that is proprietary or confidential. And identified as such. Either orally or in writing, correct. ProPilot was not owned by us. It's owned by another company. But we had the ideas of how to take this software and do stuff with it, vis-a-vis this defendant and its business and its product that had never been thought of before. Wasn't all this stuff tipped off before and what they sent out to 23 other companies? Well, what happened new that day? I've gone through the record carefully, and I can't find out what happened that day was different than everybody else already knew about. There were a couple of things not disclosed that are the most serious component of our appeal and the difference between what was disclosed before and what was disclosed that first Orlando meeting. Granted, there was discussion in the earlier January 6 document talking about all sorts of things, including the use of the Sony PlayStation, an immersion theater, a Smithsonian exhibit, and other things. That's not an issue right now on this appeal. Don't tell me what's not an issue. Tell me what was discussed that day that was new and different and confidential that wasn't discussed in all these business plans that were sent out to 23 other companies. Two things in particular. Number one, the integration of the graphical elements of ProPilot into the defendant's products to improve the functionality and feature of the defendant's product, primarily GAT-2. GAT stands for General Aviation Trainer. You will not see any reference in that first January 6 disclosure in which there is a discussion or any reference to the integration, the use of the ProPilot graphical elements in GAT-2 or any other product of the defendant. Simply not discussed. But we have evidence in the record that it was discussed specifically at that first Orlando meeting later that month because there's an agenda item in the record talking about integration issues of the hardware and the software. Secondly, second thing not disclosed prior to the first Orlando meeting is the use of the ProPilot engine that drives that software to benefit, improve, or serve as a model for the defendant's software. But that was discussed. The use of engines and different type of engines was discussed at the first Orlando meeting, and that's set out in the agenda. I'm looking at the judge's opinion on tab 208. And the second reason for the opinion is in motion neither orally nor in writing identified any information or material in its business plan as proprietary or confidential. Is that correct? No, that's error. Why? Because there is evidence in the record of several things. First, of the prior disclosure, that is, prior to the first Orlando meeting, this document that was sent out on January 6th, that's in the record. The agenda of the first Orlando meeting is in the record, showing the list of all the items discussed. And then the subsequent enhancement of those agenda items by the following document later that month. You can compare what was discussed before the Orlando meeting and during the meeting. And these particular items, the integration of the graphics and the use of the engine, were not previously disclosed. But that's in the record, and we did present that to the court. And it's in our concise statement of facts. The court also stated in the opinion that there is nothing in the agreement signed at that first Orlando meeting and in the subsequent agreement a few weeks later that provides that the defendant cannot compete with this information. Again, that's error. For example, that first contract specifically states that the party shall not use and disclose this confidential information that's identified above. That is not mentioned at all in the court's opinion. What's the significance? Maybe I just missed what you said, but the court clearly discussed the January confidentiality agreement. What is it you said was not discussed in the court's decision? The court ruled that there was no agreement not to compete with respect to the information that was disclosed. And that is error because the documents, both of these agreements, the January and the February agreement, both provide that the information shall not be disclosed and shall not be used except in a common business arrangement. We are not saying that we own ProPilot. We are saying we own the ideas of how to use ProPilot to develop a business, enhancing certain existing software and hardware items of the defendant. The defendant spent three months investigating those ideas. Its engineers concluded they were good ideas. And then ultimately we contend the defendant went around us, hired our president to implement these various ideas, and spent $400,000 to buy ProPilot to do the very thing we told him about. And there's plenty of reference in the record that the defendant not only did not know about ProPilot before we told them about it, but had no idea how to solve the defendant's basic graphical problem that it was aware of the preceding year. The fact that they didn't know about ProPilot isn't going to help you because I don't think you'll dispute that the connection to ProPilot is identified in the January 6th letter, which precedes the confidentiality agreement. So with regard to that cause of action, that can't be what the breach of the confidentiality agreement can – that can't constitute a breach of the confidentiality agreement. With regard to the existence of this product, ProPilot, no, that's correct. It's not the software. The thing about the particulars, and the allegation is that what was revealed in the January meeting and subsequent covered by this visitor's agreement modified contained particular ideas that were used by the defendant in a way that breached this agreement. Correct. They could have gone out to any computer store and seen ProPilot on the shelf themselves. We have no idea why this defendant in the general aviation training business, in the business of developing software to create these graphical images in its gap trainer, why it did not know about ProPilot. No idea. Well, it doesn't matter whether they knew about it or not, because your January 6th letter isn't protected by the – isn't covered by the confidentiality agreement. Correct. Even if it's absolutely true they were utterly ignorant, and suddenly they read this letter and say, gee, what a great idea, I don't think that helps your breach of agreement claim at all. But the next step does, and that is we're telling them what it is. We're telling them later, first as identified in the agenda of the first Orlando meeting, and then subsequently in greater detail. We're telling them later that this is how you can improve your products. If you take this engine and use it this way. If you take these graphical images and use them this way. They did not know about that until we told them. And the president of the defendant at that first Orlando meeting was so intrigued by this, he wanted to continue to receive information from us. First, in the context of a more detailed business plan. Second, sending our people to Pennsylvania to meet his engineers and to thoroughly investigate the possibility of this. So the defendant itself viewed these ideas as being significant, beyond the existence of this pro-pilot software. But rather, how do we take these key features and help the defendant improve its business and solve a solution it had been looking for, for the preceding year? The defendant claims on page 18 of their brief, that you don't contest the findings of the district court. So therefore, it is conclusively established for the purposes of this litigation, as to each of the 13 items of confidential information, that your motion were misused, the information was either widely and publicly disseminated, without restriction, and on and on. It just says basically you didn't appeal those findings, or you agree with them. That's not correct. We did not appeal the trade secret component of the decision. The trade secret claim was our third claim of relief, as I recall. We appealed the first, second, and seventh claim of relief. There is an overlap in our first and second claim of relief, dealing with these contract claims. We specifically do appeal, and we are contending, that the findings of the court, with respect to the type of information that was not disclosed prior to the first Orlando meeting, but was disclosed at the first Orlando meeting, and then subsequently. That is in play. Now, there were a bunch of other things that were categorized as trade secrets, and included in the trade secret claim that we are not contending on appeal. This idea of the Sony PlayStation, the immersion theater, the Smithsonian exhibits, and selling components of ProPilot or licensing them to other software developers, that's not what we're talking about right now. What we're talking about specifically is what was not included in the January 6th submission to the 23-plus people, including the defendant's president, but what was discussed for the first time only, and then subsequently, later in January, and that is the integration of the graphical elements into the GAT2 software and the other software, and then also the use of the engine. Those are the two things that still survive, and that are components of the contract claim that we are contending. You only have a couple of minutes left. Do you want to say anything about the seventh claim? The seventh claim we submit is not a trade secret claim. It is something else, because it's not a trade secret that the court is dealing with in that case. In that case, you have a big machine shop, people coming and going, employees there, people from the community coming in, looking at the development of this product, offering suggestions, those suggestions being incorporated into the product. That's not a trade secret. It's something else. It could be confidential information, as we have in our case. It could be proprietary information, but it's a different category of information other than a statutory trade secret. So the Supreme Court in the Cayman versus Kunow case isn't relying on the status of the information or the characteristic of this information. It's not calling it a trade secret for purposes of making its final decision instead. But why? Why wasn't that decision preempted by the I don't know how you pronounce it. The Oregon Uniform Trade Secret Act, because Cayman isn't a case dealing with statutory trade secrets. The Uniform Trade Secret Act deals with statutory trade secrets. And if you have a statutory trade secret, something happens, including preemption. But the Cayman case deals rather with the relationship between the parties. And if there is that special relationship developed over time to give rise to an implied covenant of confidentiality and non-competition, then the court will address that not because of the existence of a trade secret or something else, but because of that relationship. And the court characterized that as business ethics, not trade secrets. The trial judge on page tab two or eight, page 40, found that this UTSA or whatever it is, supersedes any remedies available under the common law tort of unfair competition. This is not. We did have an unfair competition component in our complaint. And so we're not we're not appealing that part of the decision. But Cayman versus Kunow is not an unfair competition case. It is a case dealing with the existence of an equity court's creation of an implied covenant of non-competition and disclosure, specifically because of that special relationship that existed between the parties in their business affairs when there was an absence of an agreement. Now, there's no absence of an agreement here, is there? No, but that doesn't preclude the existence of another remedy. Does the court ordinarily intervene with equitable relief when, in fact, the parties have made the deal, have entered into a nondisclosure agreement? People include legal and equitable claims that all the time in cases you have a breach of contract claim and an injunction claim. And there's nothing contradictory. Probably based on the terms of the contract. I'm saying the courts don't ordinarily infer the existence of agreements when, in fact, the parties have made agreements and have defined the terms of the confidential relationship. But the arrangement of the parties can still fall under that special relationship by which the court is going to permit an inference of non-competition and nondisclosure when that special relationship gives rise to this business morality issue that is specifically addressed in the Cayman case. And that's what the Cayman case is getting at. You could have a circumstance where parties contract, but they don't have the existence of that business morality that Cayman was getting at. Or you cannot have a contract case but have the business morality components of Cayman. So there may be some overlap in certain circumstances, and we think there is here. And we don't think that they're mutually exclusive. Thank you. Thank you. May it please the Court, Michael Garone representing the respondent Environmental Tectonics Corporation, which for ease of reference I'll refer to today as ETC. This case involves what we think is a novel contention, and that contention is that a party, ETC, which lawfully purchases a valuable asset, ProPilot, from its lawful owner, Sierra, can somehow be held liable for the use of that purchased asset to another party, NMotion, which has no right, title, or interest in that asset. This theory is advanced by NMotion on the premise that it transmitted valuable confidential information to ETC about how ETC could use ProPilot, which, although not protectable as a trade secret, is nonetheless entitled to some contractual or common law protection. It's our contention that NMotion's claims in this regard fail, and that the trial court was correct in deciding this case on summary judgment. One of the challenges in this case has been to determine precisely what information NMotion is claiming was confidential. And during the trial proceedings, discovery was had and there were interrogatories submitted, and ultimately, after all the dust settled, there were 13 separate pieces of information which NMotion claimed at trial were trade secrets or were confidential and protectable. The trial judge found, based upon uncontested and very detailed evidence presented by my client in the summary judgment proceeding, that items 1 through 8 and parts of items 9, 11, and 12 had been transmitted to numerous companies involved in the flight simulation and entertainment industries prior to the meeting in Orlando without any effort to protect confidentiality. The court further made a finding, which again is not being contested on appeal, that item number 2 and items 4 through 13 had never been used by ETC in any manner. So even if some of those were new things that were not disclosed in the initial unsolicited letter, it really didn't matter because they had never been used. So, according to the judge's opinion in this case, only items 1 and 3 were actually used by ETC. Now, item 1 involved the simple idea of acquiring the pro-pilot asset from Sierra, their owner. That is exactly how it's stated by NMotion in their ancestor interrogatories. I think as the court recognized in some of the earlier questions, the idea of acquiring the pro-pilot asset is the central thesis of the letter that was sent to my client and 22 or 23 other companies in the industry. These people, Mr. Pechnik and Mr. McHugh, who had some connection with Sierra, were trying to sell Sierra's product and interest people in possibly purchasing it so they could get involved in further development of that product. That idea of acquiring pro-pilot clearly cannot form the basis of any kind of claim that confidential information was misused because it wasn't confidential. Item number 3 is what counsel seems to be placing great reliance on today, although I would submit that in the briefs you really don't read a lot about what was said today in terms of identifying the confidential information. Item 3 involved the idea of using parts of the pro-pilot asset, the code or the software, in existing flight simulation hardware. Now, the trial court found that item 3, which is what they're relying on today, was disseminated to numerous participants in the industry, including environmental tectonics or ETC, without any efforts on behalf of InMotion to keep the information confidential. And I... Is that in the letter circuit or whatever it's described as that you were referring to before in the form of the one sent to your client as the January 6th letter? Yes, Your Honor. That's one of the major disagreements we have. The centerpiece of the letter that was sent out to my client and others was that this product was for sale and that this product could be used to either create new products or to improve products that other companies already had. Now, if you look at the first page, which is tab 171, page 30, it talks about utilizing the core technology of the pro-pilot into other products, basically. And if you go on and on and read through here, they talk about breaking up the software, breaking up the code, breaking up the components of pro-pilot, and using that software, using those codes to make new products or improve existing products. And, you know, you can go through here and there are several statements which talk about using the code, improving products, creating new products, et cetera. Now, it's true there was no mention of GATT2, which is my client's product. Perhaps they didn't know the name of that product. But the whole thrust of this was we've got something here that's useful and we can help you either create new products in this flight simulation business or use this code to augment, add to, or improve your own existing products. And so the idea that there was something new discussed at the Orlando meeting is something that we just don't agree with. And, frankly, there's no evidence in this case that anything used at that meeting in specific was ever used by my client. The entire thrust of the solicitation was this is a good product, pro-pilot. Use it in your product or create new products. And that was the centerpiece of all the discussions that occurred afterwards. The bottom line really here is, therefore, that InMotion is complaining that the idea of buying pro-pilot and using it to improve ETC's products was its idea, and, therefore, ETC could not unilaterally purchase pro-pilot from Sierra. And InMotion posits three legal theories in support of this contention, and we would submit that all three of those legal theories are without foundation. First, InMotion claims that the visitor's agreement signed on January 18th was breached. And this is untrue for several reasons. First, the visitor's agreement is an integrated contract, and it applied only to what was disclosed during the actual visit to the premises of ETC on that particular day. Second, as Judge Clifton stated, the agreement covered information that was proprietary or confidential to InMotion and that was identified as being either proprietary or confidential. So, basically, we have two tests that have to be met. Since InMotion did not own pro-pilot, the information about pro-pilot could not be proprietary, because I think we'd all agree proprietary denotes ownership. In addition, the idea of acquiring pro-pilot could not be deemed confidential because the beans had already been spilled in the prior letter. But they're saying they own the idea, not the property, not what Sierra had. They own some idea as to how to do it. Well, but, Your Honor, they've never really demonstrated by way of evidence anything but the fact that my client found out about pro-pilot and then decided to purchase it based upon the notion that it might be useful to them in improving their own products. And that was all laid out in the initial letter, which was sent out on an unsolicited basis without any designation of confidentiality. The other reason that the visitor's agreement provides no solace to InMotion is that there was no effort to designate anything as confidential that was stated during that meeting. And the evidence was from Mr. McHugh, was that it was a very broad-brush meeting in which they just talked about general principles with regards to how you could take this product, which InMotion didn't own, and utilize it in your own existing software to make things better with your products. And that was no different than the central thrust of the initial plan. And, again, I would encourage the Court, if there's any doubt as to the meaning of that original plan, to go through it and see exactly what the terms were, because there were numerous statements, as I stated earlier, about utilizing the segments or components of the ProPilot and improving existing products and making new products. So, basically, nothing disclosed at the Orlando meeting was proprietary, nothing was confidential, and there is no material fact as to – or no genuine material fact as to any designation, because there was no designation. And InMotion argues, in essence, in their brief, that the mere mention of ProPilot in the visitor's agreement means that they were designating anything as confidential. We would submit that in light of the unsolicited letter that was sent to us, spilling the beans, that clearly something more was required to put us on notice that they were claiming confidentiality or a proprietary interest in this product. The second legal theory upon which they rely is this idea that a February 10th nondisclosure agreement, which was signed in order to get the actual code for the ProPilot, that somehow gives them a right to prevent my client from purchasing ProPilot. This second agreement was entered into for one reason, to protect Sierra, the owner of the product, from any misuse of the code that we were actually being given access to. And it was signed for that reason, and there was no evidence that there was any misuse of the code. We looked at it, determined that maybe we could use it, and didn't disclose it. The only time we have ever used it or utilized it in any manner is after we purchased it. If you look at the February agreement, it's not very specifically worded, but it does say confidential information shall be used by the recipient solely for the purpose of pursuing legitimate business interests with the disclosure. It's pretty broad. So I understand you try to fill in some particulars with regard to can we use the code, but the agreement itself is broader than that. Well, again, Your Honor, it comes down to the same issue as regarding the visitor's agreement. Confidential means something. The word confidential generally means that something is private or that you've taken some steps to ensure that it remains private or secret. In this case, again, they have not shown that we utilized any confidential information. The only thing they've shown is that we acquired ProPILOT, found out about ProPILOT, and thought about utilizing it in our products, and all of that was in their initial letter, which was disseminated widely throughout the entire industry. So to the extent that they rely on that February 10th nondisclosure, they have to prove that we used some confidential information, and they haven't done so. And I think that was what the trial court held in this case, that there was no evidence, number one, that the February nondisclosure agreement was meant to thwart us from purchasing the product from its lawful owner, nor was there any evidence or proof that we violated it by using any confidential information in any manner that was adverse to the interests of InMotion. What do you say about the seventh claim, about this morality and Cayman and all that? Well, Your Honor, as far as the seventh claim goes, we disagree that Cayman was not a trade secrets case, first of all. There was no statute in Oregon at the time that Cayman was decided approximately 43 years ago. At that time, the claim was, if you look at the second paragraph of Cayman, it says, it is asserted that these improvements were trade secrets communicated to defendant Kunow in the course of a confidential relationship, giving rise to a duty not to disclose or appropriate such secrets. And so it was a trade secrets case. And the court in Cayman basically looked at all the elements that would normally go into a trade secret case, such as novelty, secrecy, and the relationship of the parties, and determined that the relationship of the parties with regards to a confidential relationship was somehow to be given perhaps a little bit more weight than the novelty or secrecy issues that were present in that case. The court in Cayman cited the restatement of torts, section 757, which was the major trade secret restatement provision at that time in the decision. The fact that Cayman gave emphasis to one element of a typical trade secrets case over another element, in other words, the relationship of confidentiality maybe outweighing novelty or secrecy, was precisely the reason I think that the Uniform Act was passed in Oregon, because there were conflicting cases from various jurisdictions, conflicting cases within Oregon, as to all the factors that would go into these particular types of cases. The Uniform Act has provisions which deal with the level of secrecy, which deal with the types of relationships that must be shown to exist in order to make out a trade secrets claims. And in our brief, I point out the provisions of the current law, which deal with all of these same issues that the Cayman court discussed back 43 years ago. And we contend that Judge Brown was completely correct in her assertion that Cayman has been preempted by the passage of the Uniform Act. And I don't think there can be any better proof of that, Your Honor, than the fact that Cayman has not been cited by any Oregon appellate court since 1989. So no other attorneys appear to be raising Cayman issues in trade secret cases, for good reason. The Uniform Act now deals with these issues in a rather substantive and coherent manner, and people rely on their statutory rights in these types of situations. The one case that the trial judge dealt with was a Ninth Circuit case, which cited Cayman shortly after the passage of the Uniform Act, but on some different point regarding injunctive relief. So no court really has cited Cayman for the proposition and motion claims that it creates a distinct common law tort of breach of confidential relationship slash unfair competition, which is, I believe, how plaintiff denominates the claim in the complaint. So we don't believe that that is a very serious legal issue in light of the fact that Cayman appears to be a dead letter, at least with regards to the jurisprudence of the state of Oregon. Unless there are any other questions, Your Honor, I think I'm done. I don't believe there was any time remaining for appellant. And if that's the case, then the case just argued is submitted. And we will move to the last case in this morning's calendar. Apologize for possibly mispronouncing somebody's name. Sure. Versus Unified Western Grocers. Thank you.
judges: Goodwin, Clifton, Rhoades